80 F.3d 1406
 68 Empl. Prac. Dec. P 44,040, 96 Cal. Daily
Op. Serv. 2533,
96 Daily Journal D.A.R. 4201,
96 Daily Journal D.A.R. 4325
Herman E. SCHNIDRIG, Plaintiff-Appellant,
v.
COLUMBIA MACHINE, INC., a Washington corporation, Defendant-Appellee.
 No. 93-35770.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Jan. 12, 1995.
Submission Vacated Jan. 23, 1995.
Resubmitted April 4, 1996.
Decided April 11, 1996.
 
 Glenn N. Solomon, Portland, Oregon, for plaintiff-appellant.
 John R. Potter, Heurlin & Potter, P.S., Lee A. Knottnerus, Horenstein & Duggan, Vancouver, Washington, for defendant-appellee.
 Joseph Posner, Encino, California, for amicus curiae National Employment Lawyers Association.
 Robert K. Udziela, Pozzi, Wilson, Atchison, O'Leary & Conboy, Portland, OR, for amicus curiae Oregon Trial Lawyers Ass'n.
 Robert J. Gregory, E.E.O.C., Washington, DC, amicus curiae.
 Douglas S. McDowell, Ann Elizabeth Reesman, McGuiness & Williams, Washington, DC, for amicus curiae Equal Employment Advisory Council.
 Appeal from the United States District Court for the District of Oregon, Malcolm F. Marsh, District Judge, Presiding.
 Before: PREGERSON and TROTT, Circuit Judges, and FITZGERALD,* District Judge.
 OPINION
 TROTT, Circuit Judge:
 
 
 1
 Herman Schnidrig appeals the district court's grant of summary judgment in favor of Columbia Machine, Inc. ("Columbia") in Schnidrig's Age Discrimination in Employment Act ("ADEA") action alleging Columbia improperly denied him a promotion because of his age and constructively discharged him. We review the district court's grant of summary judgment de novo, Jesinger v. Nevada Fed. Credit Union, 24 F.3d 1127, 1130 (9th Cir.1994), and reverse.
 
 
 2
 * FACTS AND PROCEDURAL HISTORY
 
 
 3
 Columbia is a closely held Washington Corporation owned by the Neth family. Fred Neth, Sr., is the majority shareholder, chairman of the Board of Directors, and chief executive officer of Columbia. The Board consisted of six directors: Fred Neth, Sr.; three of his children, Fred Neth Jr., Dorothy Osadchuk, and one other daughter; Bill Wells, a long time employee; and Joe Barclay, president of the Cascade Corporation.
 
 
 4
 Schnidrig, who was born in 1930, began working for Columbia as a production manager in 1980. In 1981, he was promoted to vice-president of manufacturing. In February of 1991, the president of the company, Tom Neth, resigned under pressure. Schnidrig was asked to take over the responsibilities of Tom Neth and run the company as general manager/vice-president of operations while the Board searched for a new president.
 
 
 5
 Schnidrig alleges, and we accept as true for purposes of summary judgment, that as early as June of 1991, Bill Wells told Schnidrig that during a Board of Directors meeting, Joe Barclay voiced the opinion that Columbia needed a president in the 45-50 year old range and that other directors agreed. In addition, the affidavit of Robert Showman, the manager of cost accounting, states that in the Fall of 1991, Bill Wells told him the Board was not considering Schnidrig because they wanted someone in his or her mid to late forties. Schnidrig also presented the shorthand notes of the minutes of a Board meeting held on February 25, 1992. The notes indicate during discussion regarding the preparation of materials to be sent to the executive search firm, Joe Barclay stated "they should send a copy of job description, maximum compensation level, only perk, company car, age 45-50 years, and past experience with long-term potential." Bill Wells omitted the reference to an age requirement from the final draft of the minutes.
 
 
 6
 On February 12, 1992, Schnidrig sent a memo to Fred Neth, Sr. indicating he was interested in the president's position. Schnidrig alleges that on February 19, Fred Neth, Sr. told him Joe Barclay wanted a younger man for the job and that his daughters were leaning that way as well. Schnidrig also alleges that on February 27, Fred Neth, Sr. admitted the Board discussed wanting somebody younger as the new president.
 
 
 7
 In March of 1992, the Board hired Ronald Goerss of the recruiting firm Smith, Goerss, & Ferneborg, to conduct a nationwide search for a new president and to present candidates for the position to the Board. The Board agreed the president would be selected from the candidates submitted by Goerss. The Board gave Goerss a list of six minimum qualification requirements for the position. The list included four general requirements: 1) strong work ethic; 2) warm, friendly personality; 3) effective communication skills; and 4) team leadership. In addition, the list contained two specific requirements:
 
 
 8
 (1) a minimum of 5 years broad general management experience and proven track record with a medium sized company or a division of a larger firm engaged in the design, manufacture and sale of industrial machinery and equipment; and
 
 
 9
 (2) strong operations (manufacturing) background with a thorough working knowledge of accounting and financial reporting.
 
 
 10
 Goerss indicated he relied solely on the criteria given him by the Board and that he was never instructed to, nor did he consider age in making his decisions.
 
 
 11
 Schnidrig alleges that on May 8, he again asked Fred Neth, Sr. why he could not be president of Columbia and was again told the Board was looking for somebody younger.
 
 
 12
 In June of 1992, Goerss completed his search, including interviews of all three Columbia vice-presidents, and submitted a list of five candidates to the Board. All five candidates were from outside the company. The Board interviewed two of the five candidates and, in July, entered into negotiations with Gerald O'Meara to be the president of Columbia.
 
 
 13
 Also in July, Schnidrig again applied for the position of president and alleges he was again told the Board was looking for somebody younger in the 45-50 year old range. Thereafter, Schnidrig filed his first complaint with the EEOC. Schnidrig claims that from this point on his work environment deteriorated. Particularly, Schnidrig complains Robin Popple, another Columbia vice-president, was given a raise so that he earned more than Schnidrig; he was excluded from a lunch meeting with the officers of First Interstate Bank; company executives and other personnel were instructed not to talk to Schnidrig about various matters including corporate finances; and he was moved out of his office and given a much smaller office.
 
 
 14
 On October 8, 1992, O'Meara accepted Columbia's offer and agreed to begin work on November 2, 1992. Schnidrig resigned on October 27, 1992.
 
 
 15
 Schnidrig filed suit against Columbia claiming that he was denied the promotion to president because of his age, and that he was constructively discharged in retaliation for filing a complaint with the EEOC. The district court granted summary judgment in favor of Columbia on all claims.
 
 II
 AGE DISCRIMINATION
 
 16
 The allocation of burdens and order of presentation of proof for claims of discrimination arising under the ADEA follow three steps:
 
 
 17
 [A] plaintiff must first establish a prima facie case of discrimination. If the plaintiff establishes a prima facie case, the burden then shifts to the defendant to articulate a legitimate nondiscriminatory reason for its employment decision. Then, in order to prevail, the plaintiff must demonstrate that the employer's alleged reason for the adverse employment decision is a pretext for another motive which is discriminatory.
 
 
 18
 Wallis v. J.R. Simplot Co., 26 F.3d 885, 889 (9th Cir.1994) (quoting Lowe v. City of Monrovia, 775 F.2d 998, 1005 (9th Cir.1986)).
 
 
 19
 "The prima facie case may be based either on a presumption arising from the factors such as those set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973), or by more direct evidence of discriminatory intent." Wallis, 26 F.3d at 889 (citing Lowe, 775 F.2d at 1009). Furthermore, "[w]hen a plaintiff does not rely exclusively on the presumption but seeks to establish a prima facie case through the submission of actual evidence, very little such evidence is necessary to raise a genuine issue of fact regarding an employer's motive; any indication of discriminatory motive ... may suffice to raise a question that can only be resolved by a factfinder." Lowe, 775 F.2d at 1009.
 
 
 20
 In this case, Schnidrig clearly established a prima facie case of age discrimination. Schnidrig did not attempt to establish the factors giving rise to a presumption of discrimination. Rather, Schnidrig offered direct evidence of discriminatory motives in the form of statements made by directors and notes taken during Board meetings.
 
 
 21
 Columbia argues that whether Schnidrig chooses to establish a prima facie case through a presumption or through direct evidence of discrimination, he must still show that he is qualified for the job. This argument is premature. Schnidrig established a prima facie case that he was treated differently on the basis of his age. Therefore, Schnidrig's qualifications are irrelevant to the existence of the prima facie case of discrimination. The burden shifts to Columbia to articulate nondiscriminatory motives regardless of Schnidrig's qualifications.
 
 
 22
 Columbia offered three nondiscriminatory reasons why it chose not to promote Schnidrig: 1) Schnidrig was eliminated as a candidate for the position by Goerss who did not include Schnidrig's name in the list of qualified candidates which he presented to the Board, therefore, it was not the Board's decision not to promote Schnidrig; 2) Schnidrig was not qualified for the job; and, 3) O'Meara was more qualified for the job than was Schnidrig.
 
 
 23
 The district court found that Columbia produced evidence to support its claim that O'Meara met the qualifications of the job profile and that Schnidrig did not. This was sufficient to shift the burden back to Schnidrig to show that Columbia's reasons for not promoting him were pretextual. Thus, the issue before this Court is whether Schnidrig produced sufficient evidence to raise a genuine issue of fact as to whether Columbia's proffered reasons were pretextual. "If a rational trier of fact could, on all the evidence, find that the employer's action was taken for impermissibly discriminatory reasons, summary judgment for the defense is inappropriate." Wallis, 26 F.3d at 889.
 
 
 24
 Schnidrig presented the following allegations and evidence to show discriminatory intent by Columbia: 1) Allegation that Bill Wells told Schnidrig that during a Board meeting in June of 1991, Joe Barclay expressed wanting a president in the 45-50 year old range; 2) Affidavit of Robert Showman, manager of cost accounting, stating that following a Board meeting in the fall of 1991, Bill Wells told Showman the Board was not seriously considering Schnidrig for president because they wanted someone in his or her mid to late forties; 3) Allegation that on February 19, 1992, Fred Neth, Sr. told Schnidrig some of the directors wanted a younger man as president; 4) Shorthand notes of the minutes of the Board meeting on February 25, 1992, indicating Joe Barclay that the requirement of being 45-50 years old be included in the job profile for president; 5) Allegation that on February 27, 1992, Fred Neth, Sr. admitted the Board discussed wanting somebody younger as the new president; 6) Allegation that on May 8, 1992, Fred Neth, Sr. again told Schnidrig the Board wanted somebody younger; and 7) Allegation that in July of 1992, Fred Neth, Sr. again told Schnidrig the Board was looking for somebody younger to be president.
 
 
 25
 This Court has set a high standard for the granting of summary judgment in employment discrimination cases. Most recently, we explained that " '[w]e require very little evidence to survive summary judgment' in a discrimination case, 'because the ultimate question is one that can only be resolved through a "searching inquiry"--one that is most appropriately conducted by the factfinder, upon a full record.' " Lam v. University of Hawaii, 40 F.3d 1551, 1563 (9th Cir.1994) (quoting Sischo-Nownejad v. Merced Community College Dist., 934 F.2d 1104, 1111 (9th Cir.1991)).
 
 
 26
 "[W]hen a plaintiff has established a prima facie inference of disparate treatment through direct or circumstantial evidence of discriminatory intent, he will necessarily have raised a genuine issue of material fact with respect to the legitimacy or bona fides of the employer's articulated reason for its employment decision." ... When [the] evidence, direct or circumstantial, consists of more than the McDonnell Douglas presumption, a factual question will almost always exist with respect to any claim of a nondiscriminatory reason. The existence of this question of material fact will ordinarily preclude the granting of summary judgment.
 
 
 27
 Sischo-Nownejad, 934 F.2d at 1111 (quoting Lowe, 775 F.2d at 1009). Cf. Wallis, 26 F.3d at 890 ("[W]hen evidence to refute defendant's legitimate explanation is totally lacking, summary judgment is appropriate even though plaintiff may have established a minimal prima facie case based on a McDonnell Douglas type presumption."); FDIC v. Henderson, 940 F.2d 465, 473 n. 16 (9th Cir.1991) ("However, Lowe was subsequently amended to indicate that the Court did not mean to 'prevent the summary disposition of meritless suits but simply ensure that when a material fact exists a civil rights litigant will not be denied a trial on the merits.' ").
 
 
 28
 The district court, in granting summary judgment, emphasized that Schnidrig was eliminated as a candidate for president by Ronald Goerss of the executive search firm hired by Columbia and not by the Board. The district court found there was no evidence Goerss was ever told to consider age and that he never considered age in selecting candidates for the Board's consideration. The district court concluded the comments made by Fred Neth, Sr., were attenuated from the decision-making process, and therefore, were merely "stray remarks" with no connection to the employment decision.
 
 
 29
 The Ninth Circuit authority relied on by the district court is distinguishable. In Merrick v. Farmers Ins. Group, 892 F.2d 1434 (9th Cir.1990), an executive for Farmers made one comment that he chose one candidate over another because he was " 'a bright, intelligent, knowledgable young man.' " Id. at 1438. Similarly, in Nesbit v. Pepsico, Inc. 994 F.2d 703 (9th Cir.1993), a supervisor commented during a meeting that " '[w]e don't necessarily like grey hair.' " Id. at 705. The court found this "comment was uttered in an ambivalent manner and was not tied directly to Nesbitt's termination." Id.
 
 
 30
 Contrasting, in the instant case, Schnidrig alleges that on three separate occasions, when he asked to be considered for president, he was told the Board wanted somebody younger for the job. Significantly, at least one of these instances occurred after Goerss had submitted his list of candidates to the Board. Furthermore, Schnidrig did more than offer mere allegations of discriminatory intent; he produced evidence in the form of shorthand notes taken at the February 25, 1992, Board meeting and the affidavit of a coworker.
 
 
 31
 Although it is possible that Columbia sufficiently insulated the decision-making process from the discriminatory remarks of the directors, in light of the reluctance of this Circuit to allow summary judgment where there is direct or circumstantial evidence of discriminatory intent, the district court was premature in resolving this issue on summary judgment. Whether Columbia relied on impermissible factors in refusing to promote Schnidrig is a question appropriately answered by a trier of fact.
 
 III
 CONSTRUCTIVE DISCHARGE
 
 32
 Schnidrig also contends Columbia constructively discharged him by making working conditions so intolerable that he felt forced to resign. Specifically, Schnidrig submitted six factors which, taken together, were designed to humiliate him and force him to resign: 1) He was replaced as head of the company by a man fifteen years younger than him; 2) Columbia did not give him a new position; 3) Another vice-president was given a pay raise so that he was earning more than Schnidrig; 4) He was forced to move out of his office and into a much smaller office; 5) He was excluded from a lunch meeting with officers from First Interstate Bank; and 6) Other executives were told not to speak to him about financial or other matters.
 
 
 33
 To establish a claim for constructive discharge, Schnidrig "must show there are triable issues of fact as to whether 'a reasonable person in [his] position would have felt that [he] was forced to quit because of intolerable and discriminatory working conditions.' " Steiner v. Showboat Operating Co., 25 F.3d 1459, 1465 (9th Cir.1994) (quoting Thomas v. Douglas, 877 F.2d 1428, 1434 (9th Cir.1989)).
 
 
 34
 Whether working conditions were so intolerable and discriminatory as to justify a reasonable employee's decision to resign is normally a factual question for the jury. In general, however, a single isolated incident is insufficient as a matter of law to support a finding of constructive discharge. Thus, a plaintiff alleging a constructive discharge must show some aggravating factors, such as a continuous pattern of discriminatory treatment.
 
 
 35
 Sanchez v. City of Santa Ana, 915 F.2d 424, 431 (9th Cir.1990) (internal quotations and citations omitted), cert. denied, 502 U.S. 815, 112 S.Ct. 66, 116 L.Ed.2d 41 (1991).
 
 
 36
 Schnidrig was not demoted, did not receive a cut in pay, was not encouraged to resign or retire, and was not disciplined. Accepting all of Schnidrig's allegations as true, his working conditions were not so intolerable and discriminatory that a reasonable person would feel forced to resign. Additionally, Columbia offered legitimate nondiscriminatory reasons for each of the actions complained of by Schnidrig.
 
 
 37
 The district court correctly found no evidence to suggest either that any of these actions were motivated to force Schnidrig to resign or that they made Schnidrig's working conditions intolerable. Therefore, the district court's grant of summary judgment for Columbia on the claim of wrongful constructive discharge is affirmed.
 
 IV
 AFTER-ACQUIRED EVIDENCE
 
 38
 Columbia argues that even if this Court should find a genuine issue of material fact as to whether Schnidrig was denied the promotion for improper reasons, summary judgment is still appropriate because after Schnidrig resigned, Columbia discovered a legitimate nondiscriminatory reason for which Schnidrig would have been discharged. Columbia claims it later learned Schnidrig copied and removed confidential and personnel documents without authorization in violation of the terms of Columbia's employee handbook.
 
 
 39
 The Supreme Court recently held that the use of after-acquired evidence of wrongdoing by an employee that would have resulted in their termination as a bar to all relief for an employer's earlier act of discrimination is inconsistent with the purpose of the ADEA. McKennon v. Nashville Banner Publishing Co., --- U.S. ----, ----, 115 S.Ct. 879, 884, 130 L.Ed.2d 852 (1995); see also O'Day v. McDonnell Douglas Helicopter Co., 79 F.3d 756, 759 (9th Cir.1996) ("[I]f an employer discharges an employee for a discriminatory reason, later-discovered evidence that the employee could have been discharged for a legitimate reason does not immunize the employer from liability."). Therefore, although Columbia's discovery of after-acquired evidence may bear upon the specific remedy to be ordered, it does not warrant the granting of summary judgment.
 
 V
 CONCLUSION
 
 40
 For the foregoing reasons, the district court's grant of summary judgment in favor of Columbia on Schnidrig's claim of constructive discharge is affirmed. We reverse the district court's grant of summary judgment in favor of Columbia on Schnidrig's claim of age discrimination and remand that issue to the district court for a trial on the merits.
 
 
 41
 AFFIRMED in part; REVERSED and REMANDED in part.
 
 
 42
 Each party shall bear its own costs of this appeal.
 
 
 
 *
 The Honorable James M. Fitzgerald, Senior United States District Judge for the District of Alaska, sitting by designation